IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES and NATIVE ECOSYSTEMS COUNCIL, | CV 21–136–M–DWM |
| Plaintiffs, | |
| vs. | OPINION and ORDER |
| HILARY COOLEY, in her official capacity as U.S. Fish and Wildlife Service Grizzly Bear Recovery Coordinator, et al., | |
| Defendants, | |
| and | |
| STATE OF IDAHO, | |
| Defendant-Intervenor. | |

This case arises out of a dispute over the United States Fish and Wildlife Service's (the "Service") management of grizzly bear (*ursus arctos horribilis*) recovery in the Bitterroot Ecosystem of Montana and Idaho. Nearly forty years ago the Fish and Wildlife Service and interested members of the public began scientific inquiry concerning the dearth of grizzly bears in what is now designated

1

as the Bitterroot Ecosystem.  Based on the best available science and after considerable study as well as public input from citizens in Montana and Idaho, an investigation spanning nearly fifteen years, a record of decision and rule elected to establish a nonessential experimental grizzly population through introduction of twenty-five grizzly bears into the area.  Introduction of the experimental population would happen if funds were available to locate, move, and introduce the bears.  Additionally, the record of decision incorporated other mandatory requirements as part of the reintroduction of the experimental grizzly.  Now, almost forty years have passed, and nothing has been done: no bears, no community advisory committee, no community or other educational instruction in towns or schools for bear safety, safe practices in garbage storage techniques, and other ways to reduce attracting bears.

Plaintiffs are environmental organizations that claim the Service violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") by choosing not to implement its grizzly bear recovery plans that had been adopted and by failing to finalize a proposed rule change regarding bear management.  Plaintiffs further allege that the Service must prepare a supplemental environmental impact statement ("EIS") to consider the changed circumstances regarding grizzly bears in the area.  Cross-motions for summary judgment are pending regarding the merits of Plaintiffs' claims.  Federal Defendants and

Defendant-Intervenor Idaho (collectively "Defendants") also challenge Plaintiffs'

standing. Because the Service has unreasonably delayed in implementing its 2000

Record of Decision and Final Rule regarding grizzly bears and failed to conduct a

supplemental EIS based on the changed circumstances, Plaintiffs succeed on two

of their claims. Plaintiffs' claim regarding finalization of a 2001 proposed rule

fails because Plaintiffs lack standing to pursue that claim.

**BACKGROUND**[1]

**A.      Grizzly Bears and the Bitterroot Ecosystem**

Prior to European settlement, the American West was home to an estimated

50,000 grizzly bears but, by 2000, the grizzly bear population dwindled to roughly

1000 in the coterminous United States.[2] FWS 889. European settlers killed grizzly

bears for fur, sport, and to eliminate possible threats to humans and livestock.

FWS 890. This human activity caused a precipitous drop in grizzly bear

populations, leading to the species being listed as threatened in the lower-48 States

under the Endangered Species Act ("ESA") in 1975. FWS 890. The species

remains listed as threatened to this day. *See* FWS 10602.[3] By November 2000, the

---

[1] The administrative record is cited as "FWS [page number]."

[2] The Service uses the designation "lower-48 States" to refer to this region, for consistency's sake, the same designation is used here. *See* FWS 10602.

[3] On February 6, 2023, the Service announced that it plans to explore delisting of grizzly bears in the Northern Continental Divide and Greater Yellowstone Ecosystems based on two petitions, including one from the state of Montana. *See* 88 Fed. Reg. 7658, 7658–60 (Feb. 6, 2023).

remaining grizzly bears in the lower-48 States were in six Ecosystems in Montana
(Northern Continental Divide, Yellowstone, Cabinet-Yaak), Idaho (Yellowstone,
Cabinet-Yaak, and Selkirk), Wyoming (Yellowstone), and Washington (Selkirk
and North Cascades), FWS 869, occupying merely 2 percent of their historic range,
FWS 890.

The Bitterroot Ecosystem includes much of east-central Idaho and a small
part of western Montana.  FWS 890, 10600.  It is one of the largest contiguous
blocks of Federal land in the lower-48 States and contains two wilderness areas
which themselves make up "the largest block of wilderness habitat in the Rocky
Mountains south of Canada."  FWS 869.  The area was home to widespread grizzly
bear populations until the middle of the 20th century when evidence of the bear's
last sign was found.  FWS 890.  By November 2000, the best available science
indicated that there were no grizzly bears within the Bitterroot Ecosystem.
FWS 879.  Even so, as recently as October 2022, grizzly bears have been seen in
the Bitterroot Ecosystem.  (*See* Doc. 39-1.)  The bears were captured and moved to
the Sapphire Mountains.  (*Id.*)

**B.      November 2000 EIS, Record of Decision, and Final Rule**

Ever since the Service published the Grizzly Bear Recovery Plan in 1982 it
has been planning the recovery of the bears in the Bitterroot Ecosystem.  FWS 890.
In November 2000, the Service published a Final EIS, FWS 26–793, and Record of

Decision ("ROD"), FWS 867–84, delineating "Grizzly Bear Recovery in the Bitterroot Ecosystem." It also promulgated and published a Final Rule on "Establishment of a Nonessential Experimental Population of Grizzly Bears in the Bitterroot Area of Idaho and Montana." FWS 886–932. The EIS analyzed and evaluated six alternatives: (1) restoration of grizzly bears as a nonessential experimental population with citizen management (the "proposed action and preferred alternative"); (2) restoration of grizzly bears as a nonessential experimental population with management by the Service; (3) natural recovery (the "no action" alternative); (4) no grizzly bear alternative (preventing recovery in the Bitterroot Ecosystem); (5) restoration of grizzly bears as a threatened population with full protection of the ESA and habitat restoration; and (6) restoration of grizzly bears as a threatened population with full protection of the ESA and Service management. FWS 40.

Following public comment, including comments by Plaintiff Alliance for the Wild Rockies ("Alliance"), (*see* Doc. 24-1 at ¶ 4), the Service selected alterative 1, the restoration of grizzly bears as a nonessential experimental population with citizen management, FWS 869. The Service's stated purpose for this selection was threefold: "to reestablish a viable grizzly bear population in the Bitterroot [E]cosystem"; to designate these reestablished bears as a nonessential experimental

population; and manage the process according to both § 4 and § 10(j) of the ESA

to "address local concerns."  FWS 869.

In the 2000 ROD, the Service further explained its selection.  It articulated a

detailed account of the intent to establish the Bitterroot Grizzly Bear Experimental

Population Area ("Experimental Population Area") under § 10(j) of the ESA.  The

Experimental Population Area includes 25,140 square miles making up "most of

central Idaho and part of western Montana."  FWS 870.  Management of

experimental species is not cabined by the requirements of the ESA.  Under § 10(j)

of the ESA, the Secretary may designate reintroduced populations of a species

outside of its current range but within its historical range as "experimental."  16

U.S.C. § 1539(j).  An experimental population must be separate geographically

from nonexperimental populations of the same species.  *Id.* § 1539(j)(1).

Additionally, the Secretary may authorize the release of any population of an

endangered species outside of its current range "if the Secretary determines that

such release will further the conservation of the species."  *Id.* § 1539(j)(2)(A).

Nonetheless, prior to any such release, the Secretary must determine

"whether or not such population is essential to the continued existence of an

endangered species or a threatened species."  *Id.* § 1539(j)(2)(B).  As noted,

regulatory restrictions on nonessential experimental populations are looser than

under the standard framework for protection of endangered species under § 7 of the

ESA. *See* FWS 889.  In this case, the ROD outlines the Service's plan to use the

§ 10(j) designation by flexibly reintroducing twenty-five grizzly bears into a region

after consulting citizens' comments about the potential impacts of the stricter ESA

consultation obligations.

Additionally, the ROD describes the Service's commitment to: (1) establish

a Bitterroot Grizzly Recovery Area ("Recovery Area"), a smaller subset of the

Experimental Population Area, in the Selway-Bitterroot and Frank Church

Wildernesses to act as the grizzly bears' "core habitat for survival, reproduction,

and dispersal of the recovering population"; (2) establish a Citizen Management

Committee to lead the recovery efforts; (3) implement sanitation and public

information campaigns before introducing any bears; and (4) release a minimum of

twenty-five grizzly bears into the Recovery Area over a period of five years,

"subject to the availability of funding" and "no sooner than 1 year after initiation

of formation of the [Citizen Management Committee] and initiation of sanitation

and information efforts." FWS 870–73.  The experimental reintroduction plan was

set to progress in the stages listed above.  The Final Rule, published on November

14, 2000 and codified as 50 C.F.R. § 17.84(l), implemented the Service's selected

alternative.  As discussed below, it is undisputed that other than the designation of

the nonessential experimental population, the Service has not implemented the

ROD and Final Rule.  There has been no action for twenty-two years even considering the changing circumstances.

**C.     June 2001 Proposed Rule**

In June 2001, the Service changed course.  It apparently abandoned the preferred alternative in the ROD and proposed selecting the "No Action" Alternative (alternative 3 above) as the new preferred alternative ("2001 Proposed Rule").  In 2001, the Service published a proposed rule, titled "Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of Grizzly Bears in the Bitterroot Area of Idaho and Montana; Removal of Regulation."  Had this "No Action" alternative been implemented, it would have changed the Service's grizzly bear recovery plans and removed 50 C.F.R. § 17.84(l), from the Code of Federal Regulations.  Although the 2001 Proposed Rule would officially end the reintroduction program, the proposal also notes that it "does not mean that we are permanently precluding a reintroduced population of grizzly bears into the Bitterroot Ecosystem."  FWS 1221.  The comment period on the 2001 Proposed Rule ran from June 22 to August 21, 2001, FWS 1217, and overwhelmingly yielded responses in opposition to the dramatic agency change of course, FWS 1232–33.

The 2001 Proposed Rule cited agency funding and local concerns as the impetuses for the change of course.  Specifically, it noted that the Service was

reevaluating the Final Rule "[i]n light of [its] current recovery needs for grizzly bears in other areas and [its] available resources, as well as the objections of the States that would be affected by the reintroduction of grizzly bears" and "the possibility that humans may be killed or injured as grizzly bears are introduced." FWS 1217. Unmentioned in the 2001 Proposed Rule, however, is a lawsuit filed by the state of Idaho over the Service's decision to engage in these active recovery efforts. *See* FWS 1017–34. Although the ultimate resolution of that litigation is unclear, internal Service emails indicate that the suit was the incentive for the agency's proposed course correction. FWS 1511. Even though the "No Action" alternative was never officially adopted, the record suggests it has been the agency's actual plan ever since.

The proposed "No Action" alternative confusingly incorporates some action. While it "allow[s] grizzly bears to naturally expand their current range into central Idaho and the Bitterroot Ecosystem," FWS 28, it also includes the designation of a Bitterroot Grizzly Bear Recovery Zone and a population saturation goal of 280 grizzly bears, FWS 55. Ironically, because grizzly bears are listed as a threatened species under the ESA, under the "No Action" Alternative, § 7(a)(2) protections apply to naturally repopulated grizzly bears present in the Bitterroot Ecosystem. FWS 53; *see also* 16 U.S.C. § 1536(a)(2). This in effect precludes management of peregrinated bears under § 10(j) rules.

**D.      Procedural History**

Alliance for the Wild Rockies is a non-profit organization "dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems." (Doc. 1 at ¶ 9.)  Native Ecosystems Council is a non-profit organization "dedicated to the conservation of wildlife and natural resources on public lands in the Northern Rockies." (*Id.* at ¶ 10.)  Federal Defendants are Hilary Cooley, the Service's Grizzly Bear Recovery Coordinator, (*id.* at ¶ 11), Martha Williams, the Service's Director, (*id.* at ¶ 12), and Deb Haaland, the Secretary of the Department of the Interior, (*id.* at ¶ 13) (collectively "Federal Defendants").  Finally, the state of Idaho intervened under Federal Rule of Civil Procedure 24(a) due to its interest in the conservation and management of grizzly bears in the Bitterroot Ecosystem, the majority of which is within its territorial borders.  (*See* Doc. 11 at 2.)

Plaintiffs bring three claims: (1) the Service violated the APA § 706(1) by failing to finalize the 2001 Proposed Rule (Claim I); (2) the Service violated the APA § 706(1) by failing to comply with the 2000 ROD and Final Rule (Claim II); and (3) the Service violated NEPA and the APA by failing to prepare a supplemental EIS (Claim III).  (*See* Doc. 1 at ¶¶ 80–97.)  The remedy Plaintiffs seek is a declaration that Federal Defendants have violated the APA and/or NEPA

and an order requiring the Service to prepare a supplemental EIS and to issue a

new final rule and record of decision based on the outcome of a supplemental EIS.

(*Id.*)  The parties filed cross-motions for summary judgment, (*see* Docs. 23, 27,

31), which were argued on March 7, 2023, in Missoula, Montana, (*see* Doc. 41

(Min. Entry)).

Where an agency's administrative record is complete and constitutes the

whole and undisputed facts underlying agency decision making, summary

judgment is the appropriate vehicle to address claims under the APA.  *City & Cty.*

*of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) ("[T]he function of the

district court is to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did.").

## ANALYSIS

Plaintiffs have Article III standing to pursue their claims related to the 2000

ROD and Final Rule because there is a reasonable probability that the Service's

failure to carry out those commitments have caused Plaintiffs' injury that can be

traceable to, and redressed by, the Service.  Considering the merits of the parties'

arguments, the Service has unreasonably delayed implementing the 2000 ROD in

violation of § 706(1) of the APA.  Further, because those obligations are

outstanding, and because there has likely been a significant change in

circumstances regarding grizzly bears in the Bitterroot Ecosystem in the past two decades, a supplemental EIS is required.

## I.      Standing

Standing exists under Article III, when "a plaintiff [has] (1) a concrete and particularized injury that (2) is caused by the challenged conduct and (3) is likely redressable by a favorable judicial decision." *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (internal quotation marks and alteration omitted). "[The redressability] requirement is satisfied when 'the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision.'" *Id.* at 1156 (9th Cir. 2015) (quoting *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008)). "In analyzing redressability . . . [courts] assume its existence." *Juliana*, 947 F.3d at 1170. Thus, the proper inquiry here is whether Plaintiffs have shown that forcing the Service to act could protect Plaintiffs' aesthetic, recreational, vocational, and scientific interests in grizzly bears in the Bitterroot Ecosystem.

A plaintiff "must establish standing for every claim" it brings.  *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019).  At the summary judgment stage, a plaintiff "must set forth by affidavit or other evidence specific facts, which for the purposes of the summary judgment motion will be taken to be true" to satisfy the requirements of standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks and citation omitted).  Plaintiffs have standing to pursue Claims II and III, but because their alleged harm is not redressable by a favorable decision here as to Claim I, they do not have standing to pursue that claim, which seeks to compel finalization of the 2001 Proposed Rule.

### A.     2001 Proposed Rule (Claim I)

Plaintiffs first ask that the Service be ordered to finalize the 2001 Proposed Rule.  However, even if the claim was viable, a determination here would not redress the injuries Plaintiffs have alleged.  For example, Plaintiffs state they do not want to see the 2001 Proposed Rule implemented nor do they want to see the Service abandon recovery efforts in the area.  (*See* Doc. 24 at 24.)  Finalizing the Proposed Rule would have the opposite effect because the 2000 ROD and Final Rule—which establish a nonessential experimental grizzly bear population in the Bitterroot Ecosystem—are still in effect and have codified Plaintiffs' desired course of action.  Because there is no connection to be made between Plaintiffs'

13

alleged injury, discussed below, and the Service's delay in finalizing the 2001 Proposed Rule, Plaintiffs cannot show their injury is redressable. Accordingly, because Plaintiffs lack standing to pursue Claim I, it is unnecessary to address the remaining elements of standing as it relates to Claim I.

**B.      2000 ROD, Final Rule, and Supplemental EIS (Claims II and III)**

In Claims II and III, Plaintiffs seek an order requiring the Service to implement the 2000 ROD and Final Rule and to undertake a supplemental EIS. Plaintiffs have established all three elements of standing as to these claims.

Plaintiffs submitted only one declaration describing how the Service's alleged failure to act threatens their aesthetic, recreational, vocational, and scientific interests in grizzly bears in the region. (Doc. 24-1.) Federal Defendants insist that a single declaration of harm is insufficient and argue Plaintiffs have not alleged any injury-in-fact, reductively characterizing Plaintiffs' alleged injury as merely harming their "chances of observing grizzly bears in the area." (Doc. 28 at 19.) While Plaintiffs agree they are harmed by limitations on their ability to observe grizzly bears in the Bitterroot Ecosystem, they also allege other aesthetic, vocational, and scientific harms. For example, Alliance's Executive Director Michael Garrity declares that "Alliance was an active participant in the original NEPA proceedings for Bitterroot grizzly recovery," (Doc. 24-1 at ¶ 4), and that "Alliance has invested decades of work into recovery of grizzly bears . . . in the

Bitterroot Ecosystem," (*id.* at ¶ 5). Further, Garrity declares that he and Alliance's members engage in "nature study and wildlife observation" in grizzly bear habitat and intend to continue to do so. (*Id.* at ¶ 3.)

In *WildEarth Guardians*, a single member's declaration that he had "reduced recreational and aesthetic enjoyment of areas in Nevada impacted by [Nevada Wildlife Services Program's] predator damage management programs," adequately demonstrated an injury-in-fact. 795 F.3d at 1155. He named specific wilderness areas affected and stated that he planned to visit those areas again. Because the declaration stated that the agency's activity negatively impacted the plaintiff's enjoyment of those areas by causing him to curtail his recreational activities and reducing his likelihood of seeing animals, the injury-in-fact requirement was satisfied. *Id.* Just as in *WildEarth Guardians*, Plaintiffs present only one declaration that speaks to injury-in-fact. Nevertheless, the interests identified in the declaration fall within NEPA's and the APA's scope of protections and because one declaration is sufficient, Plaintiffs have established injury-in-fact.

Federal Defendants next argue that even if Plaintiffs have experienced some injury, the injury is not traceable to the Service because it has not reintroduced nor removed grizzly bears from the Bitterroot Ecosystem. (Doc. 28 at 20.) Whether or not the Service has introduced or removed grizzly bears from the Bitterroot Ecosystem is not the issue; rather, Plaintiffs allege, *inter alia*, that the ROD legally

15

binds the Service at some point to reintroduce grizzly bears, and that by failing to do so, it has violated the APA, harming the interests outlined above. The ROD included non-discretionary commitments other than just the reintroduction of grizzly bears. Plaintiffs has also established causation.

Finally, Federal Defendants argue that "recovery planning measures are non-binding and do not impose legal obligations on any party." (Doc. 28 at 20.) Based on oral argument, this is apparently not the case. Federal Defendants fail to explain why a positive ruling for Plaintiffs in this case would not redress their complaints. Just arguing that Plaintiffs' position is incorrect does not fatally undermine their standing to bring a claim. Plaintiffs have established redressability to satisfy that element of standing.

Because Plaintiffs have established the three elements of Article III standing, the merits of Claims II and III are considered below.

## II.    Delayed Implementation of the 2000 ROD and Final Rule (Claim II)

NEPA claims are reviewed under the APA, which authorizes a court to "compel agency action . . . unreasonably delayed." 5 U.S.C. § 706(1). Section 706(1) "empowers a court . . . to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (internal quotations and emphasis omitted). Such a claim may proceed "where a plaintiff

asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* "Thus, a court may compel agency action under the APA when the agency (1) has a clear, certain, and mandatory duty and (2) has unreasonably delayed in performing such duty." *Vaz v. Neal*, 33 F.4th 1131, 1136 (9th Cir. 2022) (internal quotation marks and citations omitted). To determine whether an agency has unreasonably delayed, courts consider the following factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason;

> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Id.* at 1137 (citing *Telecomm. Rsch. and Action Ctr. v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984)) (known as the "*TRAC* factors").

Defendants maintain that because the Service has no duty to act, the *TRAC* factors are inapposite and the Court need not assess delay. Conversely, however,

Defendants have conceded that the Service unreasonably delayed if it is under a duty to act. The inaction and delay here is more than twenty-two years. Thus, the crux of this case, and this claim, comes down to whether there is a "*discrete agency action that [the Service] is required to take*." *S. Utah Wilderness All.*, 542 U.S. at 64. There is. The Service is obligated to carry out the non-discretionary commitments it made in the 2000 ROD and Final Rule. Furthermore because Defendants have conceded there has been an unreasonable delay, Plaintiffs are entitled to summary judgment on Claim II.

### A.   Duty

Plaintiffs argue that the Service is legally bound to fulfill each non-discretionary step included in the ROD. Defendants counter that the Service continues to have complete discretion to implement any and all aspects of that decision document. Their premise is that nothing in the ROD or 2000 Final Rule is mandatory. Neither argument is completely accurate: where the 2000 ROD and Final Rule outline non-discretionary activity the Service must take, the Service has a statutory duty to act.

NEPA "requires federal agencies to assess and publicly disclose the environmental impacts of proposed federal actions." *WildEarth Guardians*, 795 F.3d at 1151 (citing 42 U.S.C. §§ 4321–4347). When a Federal agency is considering a major action that "significantly affect[s] the quality of the human

18

environment," an EIS is required. *Id.* (cleaned up).  The purpose of this process is

to inform both the agency and the public of the potential environmental impact of

any given major federal action.  *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 349 (1989).  A record of decision is required at the conclusion of the EIS

process to identify and explain the agency's preferred considered alternative.  40

C.F.R. § 1505.2(a) ("At the time of its decision . . . each agency shall prepare and

timely publish a concise public record of decision," which: (1) "states the

decision"; (2) identifies alternative decisions the agency considered; and

(3) "[s]tates whether the agency has adopted all practicable means to avoid or

minimize environmental harm from the alternative selected.").  The regulations

further instruct that "[a]gencies may provide for monitoring to assure that their

decisions are carried out and should do so in important cases."  *Id.* § 1505.3.  And,

"[m]itigation [] and *other conditions* established in the environmental impact

statement or during its review and committed as part of the decision shall be

implemented by the lead agency or other appropriate consenting agency."  *Id.*

(emphasis added).

   A Council on Environmental Quality directive explains that "agencies will

be held accountable for preparing Records of Decision that conform to the

decisions actually made and for carrying out the actions set forth in the Records of

Decision."  46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981) ("Forty Most Asked

Questions Concerning CEQ's National Environmental Policy Act Regulations,"

("Forty Questions")).  Importantly, it also instructs: "the terms of a Record of

Decision are enforceable by agencies and private parties."  *Id.*  Courts have held

that "an agency is bound to commitments it makes in the ROD."  *Friends of*

*Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123 (D. Mont. 2016) (collecting cases).

The analysis in *Sparks* is instructive.  In *Sparks*, the Bureau of Land

Management stated in a record of decision that it would recalculate the appropriate

management levels of wild horses in a particular region "within five years or after

the revision to the Billings [Resource Management Plan], whichever comes first."

*Id.* at 1120.  In that record of decision, the agency committed itself to a "specific,

affirmative action" to which it did not abide.  *Id.*  The Court determined that

§ 1505.3, along with the Forty Questions memorandum and case law, "require[d]

[Bureau of Land Management] to follow through with the commitments it [made]

in a record of decision."  *Id.* at 1123 (noting that if the Bureau of Land

Management's record of decision language did "not constitute a commitment, then

no language will suffice").

Here, the Service committed to introducing twenty-five experimental grizzly

bears in the Bitterroot Ecosystem if it was able to appropriate sufficient funds to do

so.  FWS 872.  However, as Plaintiffs make clear, this is the only discretionary

aspect of the ROD to which the Service committed itself.  While the ROD and

Final Rule's main purpose is the recovery of grizzly bears in the Bitterroot

Ecosystem through the reintroduction of the species and designation as a

nonessential experimental population, the ROD clearly explains a non-

discretionary "overlapping staged process" for the implementation of this plan.

FWS 871.  The stages are outlined in the ROD as follows: (1) formation of a

Citizen Management Committee "during the first few months of implementation"

of the ROD;[4] (2) implementation of sanitation and education efforts to prepare the

land and community for the presence of grizzly bears; and (3) placement of the

bears themselves, "which will begin after the [Citizen Management Committee]

has been established and the sanitation and information programs have begun."

FWS 870–72.  These preliminary stages are neither contingent nor discretionary.

The ROD even includes a short, specific timeline for when the Service must set up

the Citizen Management Committee, much like the plan revisions in *Sparks*.

Further, to the extent that the Service conditioned the reintroduction of grizzly

bears into the Bitterroot Ecosystem on the availability of funding, *see* FWS 872,

the record does not reflect the nature or specifics of those purported financial

---

[4] The Citizen Management Committee will be comprised of 15 members including local citizens and agency representatives from Federal and State agencies and the Nez Perce Tribe.  FWS 870.  Additionally, the Citizen Management Committee will include two scientists as non-voting members to provide updated scientific information on grizzly bears.  *Id.*

limitations.  Ultimately, just like in *Sparks*, the ROD here includes non-discretionary and discrete commitments that the agency did not carry out.

In *Tyler v. Cisneros*, the Ninth Circuit held that under 40 C.F.R. § 1505.3 an agency must comply with mitigation measures it agrees to engage in during the NEPA review process. 136 F.3d 603, 608 (9th Cir. 1998).  In that case, the United States Department of Housing and Urban Development entered into an agreement with various local organizations under which it committed to request consultation with those organizations if it believed the agreement could not be carried out as originally planned.  *Id.*  The agreement was incorporated as a condition in the agency's Finding of No Significant Impact with a notice that the agency was bound by the "measures in the [a]greement." *Id*. at 606.  The court held that § 1505.3 binds an agency to commitments made during the NEPA process.  *Id.*  Just like in the agency commitments in *Tyler*, the ROD here outlines non-discretionary grizzly bear recovery planning measures.

Defendants further argue that regardless of what the ROD says, the reintroduction of a species under § 10(j) is an exercise of agency discretion.  In fact, they argue, the very purpose of § 10(j) is to provide the agency with flexibility and discretion to make decisions about the protection of experimental species populations.  Plaintiffs concede that while that may be the case, the Service already

exercised its discretion under § 10(j) when it decided to designate grizzly bears in the Bitterroot Ecosystem as a nonessential experimental population.

Section 10(j) instructs that the Secretary "may authorize the release . . . of any population . . . of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A); *see also Defs. of Wildlife v. Hall*, 807 F. Supp. 2d 972, 977 (D. Mont. 2011) ("Section 10(j) of the ESA is a way to provide greater management flexibility to those charged with the reintroduction of a species on an experimental basis."). Further, § 10(j)'s implementing regulations state, "[t]he Secretary may designate . . . an experimental population." 50 C.F.R. § 17.81(a). The Service has the discretion to designate an experimental population in the first instance, and it did so here. *See id.* So, while § 10(j) designation is entirely discretionary, a point which Plaintiffs conceded at the March 7 hearing, that discretion is no longer relevant as it ended when the nonessential experimental population was designated.

Ultimately, the non-discretionary commitments the Service lays out for itself in the ROD are binding and establish a duty to act that may be compelled under § 706(1) of the APA. These include phases 1 and 2 of the Service's recovery planning goals, namely the establishment of a Citizen Management Committee, the

exercise of education efforts, and the bear-preparation tasks, all of which may be compelled if unreasonably delayed.

### B.    Unreasonable Delay

Because the Service was under a duty to act upon non-discretionary commitments it made in the ROD, it can be compelled to take such actions if they have been unreasonably delayed. *See* 5 U.S.C. § 706(1). Defendants very purposely did not address the issue of unreasonable delay in their briefing. (*See* Doc. 39 at 12.) Through making other substantive arguments, they also conceded at the March 7 hearing that because it has been over twenty years since the ROD was issued, such delay is unreasonable. That finding is appropriate with no further discussion. Nevertheless, the *TRAC* factors, as discussed briefly below, highlight the perils of agency delay in this context.

As introduced above, there are six factors governing a court's consideration of unreasonable delay. *Vaz*, 33 F.4th at 1137. Regarding the "rule of reason" factor, the Ninth Circuit has held that a ten-year delay is "nothing short of egregious." *In re Nat Res. Def. Council*, 956 F.3d at 1142. Here, over twenty years have passed since the ROD was issued, which clearly violates the "rule of reason." Regarding the "statutory timetable" factor, Plaintiffs do not cite a statutory scheme that mandates any timeline for agency action, so none is considered here. Regarding the "human health and welfare" factor, Plaintiffs argue

that not implementing the public health and safety measures outlined in the ROD, such as proper food storage and bear-proofing, impact the public's health.  These measures were planned based on the understanding that there were no grizzly bears in the area and that would remain the case until and unless the Service reintroduced them.  Now, while it is not clear whether the bears have entered the Experimental Population Area, they have entered the Bitterroot Ecosystem.  Because the lack of preparation is likely to impact the health and safety of the people living in the area, this factor weighs in Plaintiffs' favor.

Under the fourth factor, "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority." *Telecomm. Rsch. & Action Ctr.*, 750 F.2d at 80.  Plaintiffs argue that there are no other competing priorities cited in the record.  As noted above, Federal Defendants do not refute that point, or any other; however, it is not hard to find mention of various other competing priorities in this record.  For example, grizzly bear management in the other Ecosystems are all managed by the Grizzly Bear Recovery Program, currently led by Defendant Hilary Cooley, making competing priorities even within that department apparent. *See, e.g.*, FWS 1217.  Thus, although Plaintiffs' argument is unrefuted for the fourth factor, it does not weigh in Plaintiffs' favor.

Regarding the "interests prejudiced" factor, the Final Rule here was implemented under Section 10(j) of the ESA. The ESA places a high priority on preserving listed species, which is an interest of paramount importance. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Therefore, recovery of the nonessential experimental population of grizzly bears in the Bitterroot Ecosystem is a high priority that has been prejudiced by the twenty-year delay, weighing this factor in favor of Plaintiffs.

Finally, "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *Telecomm. Rsch. & Action Ctr.*, 750 F.2d at 80 (internal quotation marks omitted). Plaintiffs argue that the Service is clear that it has no intention to implement the ROD, *see* FWS 10494 ("Reintroduction has not occurred and there are currently no plans to do so."), even though years of scientific research and thousands of public participants decided it was the best option for grizzly bear recovery. So, while no impropriety is present, the Service has acted contrary to the public's and to its own stated interests. Therefore, this factor also weighs in Plaintiffs' favor.

Because Plaintiffs' analysis is unrefuted and the *TRAC* factors favor Plaintiffs, there is no question or argument that the Service has unreasonably delayed in carrying out the non-discretionary commitments in the ROD in violation of the APA.

III.    **Failure to Prepare a Supplemental EIS (Claim III)**

NEPA does not squarely address when an agency is required to supplement

an EIS, but its implementing regulations do.  *See Marsh v. Or. Nat. Res. Council*,

490 U.S. 360, 370 (1989).  Those regulations "impose a duty on all federal

agencies to prepare" a supplemental EIS, *id.* at 372, if "a major Federal action

remains to occur" and either substantial changes or significant new circumstances

are present, 40 C.F.R § 1502.9(d).  While an initial EIS is generally sufficient, in

certain circumstances an agency must "take a 'hard look' at the new information to

assess whether supplementation might be necessary." *S. Utah Wilderness All.*, 542

U.S. at 73.  Supplementation is necessary "when the remaining governmental

action would be environmentally 'significant.'" *Friends of Animals v. U.S. Fish &

Wildlife Serv.*, 28 F.4th 19, 33 (9th Cir. 2022) (citing *Marsh*, 490 U.S. at 372).

However, "an agency need not supplement an EIS every time new information

comes to light after the EIS is finalized." *Marsh*, 490 U.S. at 373.

Plaintiffs insist that both significant new circumstances and substantial

changes require a supplemental EIS.  Defendants claim that no major federal action

"remains to occur" and thus no supplemental EIS is required.  The parties' briefing

on this issue is like two ships passing in the night.  Plaintiffs focus heavily on the

significant new circumstances and substantial changes they argue exist.

Defendants, on the other hand, focus on the threshold issue of "no major Federal

action," conceding the second element of the test set forth in 40 C.F.R § 1502.9(d).

Because the non-discretionary requirements in the ROD constitute a major federal

action that remains to occur, and because there has potentially been a significant

change in circumstances over the past two decades, a supplemental EIS is

warranted.

### A.    Major Federal Action

Defendants argue that since the ROD and Final Rule were approved and

published in November 2000, and because the Service has clearly committed itself

to not introducing grizzly bears into the Bitterroot Ecosystem, there is no

outstanding major federal action.  Even so, they also conceded in both their

briefing and at the March 7 hearing that a supplemental NEPA process is required

if the Service either chooses to reintroduce grizzly bears in the future, (Doc. 28 at

37 n.5), or if there is some compellable action required of them under the 2000

ROD and Final Rule.  Plaintiffs correctly insist that the Service's outstanding

commitments in the ROD constitute a pending major federal action.

A major federal action is "an activity or decision subject to Federal control

and responsibility subject to" a set of enumerated exceptions.  40 C.F.R.

§ 1508.1(q).  The exceptions include, in relevant part, that a major federal action

does not include "[a]ctivities or decisions that are non-discretionary and made in

accordance with the agency's statutory authority."  *Id.* § 1508.1(q)(1)(ii).  A

proposed action that requires finalization is a major federal action that remains to

occur while any discretionary actions that an agency may choose to take is not.

*See S. Utah Wilderness All.*, 542 U.S. at 73.

In *Southern Utah Wilderness Alliance*, the plaintiffs argued that a Bureau of

Land Management land use plan managing a Wilderness Study Area was a major

federal action and that evidence of increased off road vehicle use was "significant

new circumstances or information" that required supplemental NEPA analysis

under § 1502.9.  542 U.S. at 73.  The Supreme Court held that the land use plan

that was approved and was currently in effect was the major federal action: "that

action [wa]s completed when the plan [wa]s approved." *Id.*  The Court never

reached the issue of whether "significant new circumstances or information" were

present. *Id.*  Even if there was any change of circumstances regarding off road

vehicle use, that information was irrelevant because there was nothing the agency

was required to do. *Id.* at 74.

Here, under the applicable regulations, and by the Service's own admissions,

the outstanding agency actions required of the Service constitute a major federal

action.  As further described above, the Service is required to complete the non-

discretionary commitments it made in the ROD.  *See* 40 C.F.R. § 1508.1(q)(1)(ii).

In *Marsh*, the Supreme Court held that a major federal action remained to

occur when a large dam was one third completed but was still under construction.

*See* 490 U.S. at 366–67.  Similarly here, Defendants argue that the major Federal action was completed upon finalization of the Final Rule in November 2000.  And, they argue that because the Service has not and does not plan to reintroduce grizzly bears, there is no pending major federal action.  While it is true that a major federal action was completed upon finalization of the Final Rule, the Service is not so easily off the hook because non-discretionary duties remain to occur.  Because the various sections of the ROD are severable, the extant non-discretionary commitments in the ROD that have been unreasonably delayed constitute a major federal action that "remains to occur."  The agency can not have it both ways.  It must either "fish or cut bait."

### B.    Changes

In the past two decades, significant new circumstances regarding grizzly bears in the Bitterroot Ecosystem are seemingly present.  Plaintiffs argue that the current, if intermittent, natural presence of peripatetic grizzly bears in the Bitterroot Ecosystem, when no such presence existed when the 2000 ROD and Final Rule were published, presents "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(d)(1)(ii).  Defendants contend instead that although there have been recent sightings of grizzly bears, no established populations have

been found, and thus grizzly bears have not been reestablished in the Bitterroot

Ecosystem.  As of their January 2022 Answer, Federal Defendants

> aver that in the last five years, there have been verified sightings of
> grizzly bears in the headwaters of the east fork of the Bitterroot River;
> in the Miller Creek area to the south of Missoula; in the Trail Creek
> area east of Lost Trail ski area; at the Stevensville Golf Course; along
> Lolo Cr/Hwy 12 just west of Lolo, Montana; and near the Lochsa River
> in Idaho southeast of Lolo Hot Springs.

(Doc. 6 at ¶ 62.)  The Service has even updated its "may be present" map for

grizzly bears, *see* FWS 10600, while also reporting that "no known *population*"

exists in the Bitterroot Ecosystem, FWS 10605 (emphasis added).

Importantly, "a population qualifies as a section 10(j) experimental

population "only when, and at such times as, the population is *wholly separate*

*geographically* from nonexperimental populations of the same species." *United*

*States v. McKittrick*, 142 F.3d 1170, 1175 (9th Cir. 1998) (quoting 16 U.S.C.

§ 1539(j)(1)) (emphasis added).  Thus, the § 10(j) designation and every

commitment associated with the ROD is based on the now changed historical

premise that there are no grizzly bears present.  The premise that grizzly bears

were not present in the Bitterroot Ecosystem when the ROD and Final Rule were

published was scientifically accurate at that time.  But the current presence of

naturally occurring grizzly bears is a significant change in circumstances that

undermines the basic premise on which the ROD and Final Rule were based.  It

may impact the advisability or feasibility of introducing an experimental

population of bears.

Plaintiffs also argue that there have been substantial changes to the proposed

action because though the Service never finalized its 2001 proposal to choose the

"No Action" alternative from the 2000 EIS, it essentially chose that alternative

anyway by never introducing grizzly bears into the Bitterroot Ecosystem.

Essentially, they argue, that *through its actions* the agency has adopted the "No

Action" alternative in practice if not officially in name.

In *Klamath Siskiyou Wildlands Center v. Boody*, the Ninth Circuit held that

supplemental NEPA process was required when an agency adopted a policy

decision mere months after completing an EIS that "closely resemble[d] the

rejected alternative." 468 F.3d 549, 562 (9th Cir. 2006). Similarly here, the

Service has practically adopted the "No Action" alternative, rejected in the EIS,

ROD, and Final Rule that were published mere months before its direction

reversal. At the very least, the agency adopted a policy that implemented a

rejected alternative legally established less than a year after it had rejected the "No

Action" policy choice. That is a substantial change in the proposed action. The

Service identified grizzly bear reintroduction into Bitterroot Ecosystem as a

priority twenty years ago. If that is no longer a priority, the Service cannot simply

continue to ignore it. For the past two decades, the Service has acted as though the

2000 ROD and Final Rule never existed in the first instance.  While an agency may procedurally alter course, if it does so it must abide by NEPA and the APA.  It cannot ignore its own decisions as reflected in a ROD and final rule.

## IV.   Remedies

Having determined the Service has violated the APA and NEPA, the last question here is what is the appropriate remedy.  Plaintiffs present a moving target but now request the following, specific remedies order the Service to: (1) not implement the 2001 Proposed Rule, remove the § 10(j) rule, and prepare a supplemental EIS for Bitterroot grizzly bear recovery; (2) issue a new ROD after the EIS is complete; and (3) "commence implementation of the new Record of Decision within one calendar year of signing the Record of Decision." (Doc. 35 at 24–25.)  "Defendants deny that Plaintiffs are entitled to the relief requested or any relief whatsoever." (Doc. 6 at 20.)  As is often the case, the proper remedy lies somewhere in the middle.

For the reasons discussed above, the Service must comply with the non-discretionary legally binding commitments made in the 2000 ROD and Final Rule.  The usual remedy for a violation of § 706(1) is to compel the action unreasonably delayed.  *See In re A Cmty. Voice*, 878 F.3d 779, 788 (9th Cir. 2017).  But, as Defendants made clear at the March 7 hearing, a supplemental EIS is also required given the amount of time that has elapsed and the fact that an updated EIS may or

may not change the agency's chosen course for grizzly bear recovery in the

Bitterroot Ecosystem.  Thus, despite the agency's decades of inaction, further

delay may be the most appropriate remedy to ensure that grizzly bear recovery

efforts are based on contemporaneous and accurate scientific data.  Plaintiffs also

recognize this challenge.  The remedy conundrum creates the unenviable prospect

of forgiving one wrong to prevent another.  Even so, the appropriate remedy here

is to remand to the Service for the preparation of a supplemental EIS to be

undertaken within a reasonable timeframe with the recognition that if it is not

completed, immediate enforcement of the nondiscretionary portions of the 2000

ROD and Final Rule will be ordered.

## CONCLUSION

Based on the forgoing, IT IS ORDERED that Plaintiffs' motion for

summary judgment (Doc. 23) is GRANTED in PART and DENIED in PART.  It is

GRANTED on Claims II and III as outlined above and DENIED as to Claim I.

This matter is REMANDED to the Service for the preparation of a supplemental

EIS and if warranted, a new ROD and final rule.  On or before April 15, 2023, the

Service shall file a notice proposing a detailed timeline for the completion of that

process.  If not provided by this date, the Court will impose a timeline.  Plaintiffs

shall have fourteen (14) days from the date of that filing to object to the

reasonableness of the agency's proposal.

IT IS FURTHER ORDERED that Federal Defendants' (Doc. 27) and

Defendant-Intervenor's (Doc. 31) cross-motions for summary judgment are

GRANTED as to Plaintiffs' Claim I and DENIED in all other respects.

DATED this _15th_ day of March, 2023.

11:06 A.M.

Donald W. Molloy, District Judge
United States District Court